Hon. Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.  CR08-296-RSM |
| | ) | |
| Plaintiff, | ) | UNITED STATES' MOTION TO |
| | ) | TAKE DEPOSITIONS |
| v. | ) | |
| | ) | **Noted: October 23, 2009** |
| JEFFREY I. GREENSTEIN, | ) | |
| CHARLES H. WILK, and | ) | |
| MATTHEW G. KRANE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I. INTRODUCTION

The United States of America hereby moves this Court for an order granting leave to take depositions of four witnesses in London, England, pursuant to Federal Rule of Criminal Procedure 15(a)(1).  Jeffrey Greenstein, Charles Wilk and Matthew Krane are charged with offenses stemming from their involvement in a fraudulent tax shelter known as "POINT."  Defendants purposefully implemented critical components of this scheme outside the United States utilizing the services of several foreign individuals including, Chris Donegan, John Staddon, Rajan Puri, and Martin Peters.  These foreign individuals have personal knowledge of Defendants' offshore conduct.

Donegan, Staddon, Puri and Peters, who are all citizens and residents of the United Kingdom, have refused to voluntarily appear in the United States for trial.  They have, however, consented to depositions in London.  Their testimonies are essential to the government's case in chief and no other witness subject to this Court's subpoena power can provide comparable testimony.  Having willfully chosen to conduct their offense in a

1  foreign venue outside the scrutiny of U.S. regulators, Defendants should not now be

2  permitted to use that circumstance as a further shield to hinder criminal prosecution.  The

3  circumstances in this case are, therefore, "exceptional," as provided for in Fed. R. Crim.

4  P. 15(a)(1), and the failure to depose the foreign witnesses for use at trial would result in

5  a miscarriage of justice.

6                              **II.  FACTUAL BACKGROUND**

7  **A.    The Fraudulent Tax Shelter**

8          The essence of the charged fraudulent scheme is that Greenstein and Wilk

9  knowingly designed and orchestrated a tax shelter built upon a series of fake transactions,

10  and that they willfully attempted to deceive the IRS and others in order to obtain millions

11  of dollars in fees and cheat the government out of hundreds of millions of dollars in taxes.

12  Greenstein and Wilk marketed POINT through their firm, Quellos Customs Strategies,

13  LLC, as an investment vehicle that happened to also provide U.S. investors with tax

14  benefits.  Written material disseminated by Quellos explained that a certain "offshore

15  investment fund" owned shares of stock in well known, publicly-traded technology

16  companies.  Purportedly replicating a well known European investment strategy, the fund

17  first, formed a number of partnership entities, known generically as Special Purpose

18  Vehicles ("SPVs"); second, contributed into each SPV portions of the technology stocks

19  that it owned; and third, caused each SPV to issue a "covered warrant" against their

20  respective basket of stocks.  Subsequently, the covered warrants were placed with a

21  European "bank" that supposedly paid millions of dollars in premiums to the SPVs for the

22  right under the warrant to purchase the stocks inside the SPV in five years at a set price.

23  Once the warrants were thus placed and the premiums credited to the SPVs, the fund

24  sought to sell the SPVs as a package to other investors.  Quellos apparently only

25  discovered this opportunity when the bank that had subscribed to the warrants approached

26  them to market the SPVs to U.S. individuals.

27          According to Quellos, the SPVs were an attractive investment because the

28  premiums from the covered warrants, coupled with the potential for a rise in the price of

US Motion to Take Depositions/ – 2
US v. Greenstein et al, CR08-296RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the stocks in the SPVs, could provide good returns.  For a U.S. investor, the SPVs also

2  presented a fortuitous tax savings opportunity.  As explained by Quellos, the technology

3  stocks in the SPVs had fallen significantly in value from the time the fund originally

4  acquired them, resulting in substantial unrealized losses for the fund.  Under certain

5  circumstances prescribed by the tax code, a U.S. taxpayer who purchased the SPV from

6  the fund could inherit the entirety of the unrealized losses.  These unrealized losses could

7  then be used by the U.S. taxpayer to offset gains from the sale of other appreciated assets

8  that the taxpayer happened to own and wanted to sell.  In other words, by purchasing the

9  SPV and then mixing the losses from depreciated stocks with the gains from the

10  appreciated assets, a U.S. taxpayer could avoid paying capital gains taxes.  As a result of

11  Quellos' marketing efforts, six individuals engaged in POINT and collectively attempted

12  to avoid approximately $400 million in capital gains taxes.

13      The evidence will show, however, that the POINT story was complete fiction,

14  willfully fabricated by Greenstein and Wilk to deceive the IRS.  These magical

15  transactions that purportedly offered attractive investment returns while at the same time

16  providing hundreds of millions of dollars in tax savings were nothing but sham

17  transactions based on false statements, fraudulent documents, secret agreements, and

18  concealment of the truth.  The "offshore investment fund" touted by Quellos as the

19  independent genesis of POINT was not a bonafide fund at all but a shell corporation

20  appropriated by Greenstein and Wilk for the sole purpose of implementing a tax shelter.

21  Every action of this "fund" was directed by Greenstein and Wilk in a series of

22  orchestrated steps, pre-ordained to provide the precise tax benefits desired by their clients.

23  And each of these steps were documented with phony contracts, agreements, financial

24  statements and accounting book entries that bore no relation to the economic substance of

25  what actually occurred.  For example, the "covered warrants" were documented through

26  sham subscription agreements and book entry statements that on paper appeared to show

27  the payment of millions of dollars in premiums by a bank to the SPVs.  However, the

28  Defendants well knew that no premiums were ever paid or were going to be paid by the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    subscribing bank.  The Defendants also knew that the devalued "stocks" purportedly

2    owned by the fund and contributed to the SPVs never existed in the first place.  The

3    hundreds of millions of dollars in losses that purportedly flowed from these stocks and

4    claimed by taxpayers on their tax returns as genuine economic losses, were knowingly

5    and willfully fabricated by the Defendants out of thin air through the execution of false

6    contracts and misleading accounting book entries.  These false and misleading documents

7    were knowingly designed to create the impression that an entity owned stocks that had

8    fallen in value whereas, in truth and fact, the entity owned nothing.

9    **B.**    **Role of Witnesses in the UK**

10         The proof of Defendants' intentional deceit rests primarily with the testimonies of

11   four prospective witnesses who all reside in England.  Chris Donegan, John Staddon, and

12   Rajan Puri are former employees of an entity known as European American Investment

13   Group, or "Euram."  Donegan, Staddon and Puri, at the direction of Greenstein and Wilk,

14   provided the overseas execution services for each of the POINT transactions.  Martin

15   Peters is a chartered accountant.  Peters provided accountancy services to Euram and had

16   managerial responsibility for a variety of companies beneficially owned by an individual

17   named Leon Brenner, including the shell company that played the role of the "offshore

18   investment fund" in the POINT transactions.

19         During IRS's investigation of this case, each of these individuals, while refusing to

20   come to the United States, consented to interviews in London.  The interviews of

21   Donegan, Staddon, Puri and Peters provided the government with eyewitness accounts of

22   what the foreign entities and transactions that make up POINT actually consisted of.

23         Staddon and Puri also voluntarily provided to the government copies of critical

24   emails with the Defendants and other communications -- evidence that neither Quellos

25   nor any other U.S. witness had provided to any of the investigative bodies involved in this

26   case.  For example, Greenstein and Wilk are charged with conspiring to launder monetary

27   instruments in connection with a scheme to pay a secret kickback to Matthew Krane.

28   Krane, at the time, was the personal attorney for Haim Saban, one of the clients who

1   participated in POINT.  Krane advised Saban to purchase a POINT tax shelter.  Staddon

2   and Puri provided emails from Wilk's Quellos email address, in which Wilk discussed

3   plans to establish an offshore bank account for the benefit of Krane, and the diversion of

4   millions of dollars in fees that Saban paid to other entities to Krane.  Despite a subpoena

5   from the government requiring the production of such email communications, Quellos has

6   to date not produced such emails.  Four examples of emails provided by Staddon and Puri

7   are attached as Exhibit A.

8       Furthermore, Staddon provided the government with a recording of a telephone

9   conference call between himself, Donegan, Greenstein and Wilk that took place in

10  February, 2000.[1]  The recorded call contains direct evidence that Greenstein and Wilk

11  engineered each step of the POINT transaction, including the actions of the so called

12  "investment fund."  The conversation confirmed that Greenstein and Wilk knew that the

13  investment fund did not possess any real stock, that the lack of real stock would pose a

14  problem for the IRS, and that clients and attorneys reviewing the transaction were, at the

15  time, unaware of this critical fact.  A draft transcript of the call is attached as Exhibit B.

16  In sum, Staddon, Puri and Donegan are the only government witnesses who can lay the

17  necessary foundation for the introduction of critical evidence and testify as to its content.

18      Based on the interviews and evidentiary materials, the government anticipates that

19  the testimonies of these foreign individuals will further include the following:

20      *1.*     ***Chris Donegan***

21      Donegan first came to know Greenstein when he was employed with the Swiss

22  Bank, UBS.  UBS and Donegan worked with Greenstein and Quellos on a variety of tax

23  shelters.  Greenstein and Wilk developed the POINT concept sometime in 1999, and

24  approached Donegan to assist them in executing the transaction.  Donegan understood

25  from the beginning that POINT was simply a vehicle to avoid tax and not a legitimate

26  investment strategy.  Donegan believed that in 1999, Greenstein and Wilk were looking

27

28      [1]  Counsel for both Greenstein and Wilk are in possession of all evidence provided by these individuals to date, as well as all memoranda of interviews regarding these foreign individuals.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    for real depreciated assets to use as the source for offsetting losses in the POINT

2    transaction.  At some point, in late 1999 or early 2000, the search for real assets was

3    abandoned and Greenstein and Wilk settled upon creating "synthetic," or fake, assets.  By

4    this time, Donegan had left UBS and joined the newly formed entity Euram, along with

5    another former UBS colleague, John Staddon.

6          In February 2000, Donegan and Staddon participated in a telephone conference

7    call with Greenstein and Wilk to discuss the steps required to execute POINT.  Donegan,

8    with the knowledge of Staddon, decided to record a portion of the call because they were

9    concerned about possible civil liabilities stemming from POINT, and wanted assurances

10   from Greenstein and Wilk that the nature of the transaction, including the synthetic nature

11   of the stocks, would be made transparent to all relevant parties.  Even after the call,

12   Donegan continued to be confronted with incidents that indicated Greenstein and Wilk

13   were being less than forthcoming to clients and advisors.

14         **2.    _John Staddon_**

15         Staddon joined Euram from UBS in December 1999.  He was introduced to

16   POINT in late 1999 after he joined Euram.

17         Staddon's role in POINT was to understand the transaction, to determine the

18   various agreements needed to document the steps in the transaction, and to assist in

19   drafting such agreements.  Staddon understood from Greenstein and Wilk that POINT

20   was to be based on "synthetic" stocks and not any real stocks.  Staddon, with the

21   knowledge of Greenstein and Wilk, directed two Isle of Man shell entities to create a

22   synthetic stock portfolio to be used as the offsetting losses for the POINT taxpayers.

23   Rather than having a company acquire any real stocks, Staddon directed one Isle of Man

24   shell entity called Jackstones Limited to simply sign a series of contracts purporting to

25   sell another Isle of Man shell entity named Barnville Limited nearly $9 billion worth of

26   publicly-traded technology stocks.  Staddon then directed Barnville to simultaneously

27   execute loan agreements with Jackstones, loaning the same "stocks" back to Jackstones in

28   return for cash collateral exactly equal to the sales price of the stock.  The simultaneous

1    purchase and loan-back of the stocks eliminated the need to have any stocks or cash

2    actually exchange hands.  Staddon, however, knew that Jackstones never owned any

3    technology stocks to sell in the first place and Barnville never possessed sufficient funds

4    to pay for even a fraction of the stock portfolio.  Once the synthetic portfolio was thus

5    documented, Barnville took on the role of the POINT narrative's "offshore investment

6    fund." According to Staddon, Barnville did not have any independent reason for doing

7    what it did other than to be a vehicle for Quellos to implement its tax shelter strategy.

8        Staddon also assisted in drafting the documents by which the various POINT SPVs

9    purportedly issued and placed covered warrants with a "bank" in return for millions of

10   dollars in premiums.  According to Staddon, the covered warrants were simply paper

11   transactions with no economic substance and that Greenstein and Wilk were well aware

12   of the fact.  The bank that purportedly subscribed to the warrants was Euram itself, who

13   had no intention or ability to actually pay the tens of millions of dollars due under the

14   warrants' subscription agreements.

15       Finally, Staddon also had concerns about potential civil liabilities for

16   implementing POINT, and sought repeated assurances from Greenstein and Wilk that

17   they were being transparent to clients and their attorneys about the true nature of the

18   transaction, including the fact that the loss stocks were all virtual.  Despite that, Staddon

19   confirmed upon review that Quellos' written marketing material explaining POINT, and

20   the legal opinions describing POINT all contained false and misleading statements about

21   the "offshore fund" and whether it possessed any real stocks.

22       ***3.    *Rajan Puri*

23       Puri, also a former UBS employee, joined Euram in January 2000.  He assisted

24   Staddon in drafting and shepherding the necessary documents that comprised each step of

25   the POINT transactions.  Puri confirmed that the "offshore fund" in Quellos' POINT

26   narrative was nothing more than an Isle of Man shell entity with no real assets,

27   appropriated purely for the purpose of executing Quellos' tax shelter.

28       Puri also has personal knowledge of the movement of millions of dollars in fees

1   paid by Haim Saban to an account at Euram Bank that was established for the benefit of

2   Matthew Krane.  Puri, at the direction of Wilk, introduced Krane to Euram bank in order

3   for him to establish an offshore account in the name of a shell corporation.  Also at the

4   direction of Wilk, Puri assisted in diverting approximately $8 million in fees Saban

5   believed he was paying another entity to Krane's account.

6        ***4.   _Martin Peters_***

7        Peters had a relationship with the Quellos firm prior to his involvement in POINT.

8   In or about 1998, Peters administered, on behalf of an individual named Leon Brener, a

9   number of offshore shell entities that were created and used by Quellos to implement a

10  different tax shelter strategy executed by Quellos prior to the POINT transactions.  A

11  company owned by Leon Brener was paid by Quellos for the creation and use of these

12  shell entities.

13       In early 2000, Peters informed the administrators of two separate Isle of Man shell

14  entities, Jackstones Limited and Barnville Limited, that they would be used in

15  implementing a new tax shelter strategy developed by Quellos.  Peters explained that

16  Leon Brener ultimately controlled both Jackstones and Barnville, knew Quellos, and

17  approved the use of the companies for this purpose.  Peters informed the two shell entities

18  that they will need to engage in paper transactions with each other to create a "virtual"

19  portfolio of stock.

20       Peters was also personally involved in negotiating the engagement of a UK based

21  accounting firm to "audit" the stock positions that had been purportedly purchased by

22  Barnville from Jackstones.  These "audits" were used as proof for clients and ultimately

23  the IRS that Barnville purchased stocks at the times and for values represented.  Peters

24  knows that the "audits" merely consisted of the accounting firm looking at the self

25  serving contracts and the matching accounting entries that recorded the contracts.  No

26  independent verification was made by the accounting firm as to whether the stocks

27  actually existed.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# III.  ARGUMENT

Under Federal Rule of Criminal Procedure 15(a)(1), a court may authorize the deposition of a prospective witness "because of exceptional circumstances and in the interest of justice."  Exceptional circumstances are found in instances "when the prospective deponent is unavailable for trial and the absence of the testimony would result in an injustice."  *United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998).  Whether the absence of testimony would produce an injustice often hinges on the materiality of that testimony to the case.  *See, e.g., Sanchez-Lima*, 161 F.3d at 548 (holding that Rule 15 depositions of defense witnesses should have been granted because their testimony supported defense theory of self-defense).  "When a prospective witness is unlikely to appear at trial and his or her testimony is critical to the case, simple fairness requires permitting the moving party to preserve that testimony by deposing the witness -- absent countervailing factors which would render the taking of the deposition unjust."  *United States v. Drogoul*, 1 F.3d 1546, 1552 (11th Cir. 1993).

While unavailability and materiality are, therefore, common factors a trial court may consider in granting or denying a Rule 15 deposition, the Ninth Circuit emphasized that Rule 15(a) "does not require any conclusive showing of 'unavailability' or 'material testimony'" before a deposition may be authorized.  *United States v. Omene*, 143 F.3d 1167, 1170 (9th Cir. 1998).  Ultimately, the court must exercise its discretion in determining from the particulars of each case, whether "due to exceptional circumstances it is in the interest of justice that the testimony of a prospective witness be taken and preserved for possible use at trial."  *Id.*

## A.    UK Witnesses Are Unavailable for Trial

Witnesses who are beyond the subpoena powers of the United States and who refuse to voluntarily attend trial are considered "unavailable" for purposes of Rule 15 depositions.  *See United States v. Medjuck*, 156 F.3d 916, 920 (9th Cir. 1998) (Canadian witnesses found unavailable for trial since they were beyond court's subpoena power and refused to voluntarily attend).  The four prospective witnesses sought to be deposed by

1   the United States -- Chris Donegan, John Staddon, Rajan Puri, and Martin Peters -- are

2   each citizens of the United Kingdom and reside in England.  *See* Declaration of Jeff

3   Coopersmith, Counsel to John Staddon and Rajan Puri, attached as Exhibit C;

4   Declarations of Don Buchwald, Counsel to Chris Donegan and Martin Peters, attached as

5   Exhibit D.  Because all four prospective witnesses are thus foreign nationals located

6   outside the United States, they are beyond the subpoena powers of the Court.  *See* 28

7   U.S.C. § 1783.  On September 17, 2009, the United States Attorneys Office requested that

8   each witness voluntarily appear at trial and offered to provide necessary accommodations.

9   *See* Letters to Jeff Coopersmith and Don Buchwald, attached as Exhibit E.  All four

10  witnesses refused to voluntarily attend trial, but represented through their counsel that

11  they will submit to depositions in England.  *See* Declarations of Coopersmith and

12  Buchwald.  Donegan, Staddon, Puri and Peters are thus "unavailable" pursuant to Rule

13  15.

14  **B.    Failure to Grant Depositions Will Result in Injustice**

15          The anticipated testimonies of the UK witnesses are highly material, going to the

16  core of the contested issues at stake in this case, and their absence will result in the

17  government's inability to present critical evidence of Defendants' intent to defraud.

18  Greenstein and Wilk are charged with conspiring to defraud the IRS and their clients by

19  implementing a tax shelter that consisted of fake transactions, including fake stock

20  transactions.  As evidenced by prior sworn statements of Jeffrey Greenstein himself, the

21  defense will seek to contest such facts.  On August 1, 2006, Greenstein testified before

22  the Senate's Permanent Subcommittee on Investigations regarding POINT.  The

23  Subcommittee was investigating purveyors of offshore tax shelters, including Quellos.

24  During the testimony, Greenstein refuted the Subcommittee's conclusion that, among

25  other things, the stocks purportedly owned by the "offshore fund" never existed.

26  Greenstein stated, "... the report erroneously characterizes book entry transactions as fake.

27  Every day, trillions of dollars of securities, commodities, and Treasury obligations are

28  traded on a book entry basis."

1    But these "book entry transactions," thus acknowledged by Defense as being

2    central to this case, were executed in the U.K. through the assistance of the very

3    individuals that Defense now seek to preclude the government from presenting to the

4    jury.  The Defendants are well aware that no other government witness has the direct,

5    personal knowledge to testify about what actually occurred in these foreign transactions.

6    In order for the jury to fully and fairly evaluate whether or not these foreign transactions

7    were shams, the government must have the ability to present the testimonies of Donegan,

8    Staddon, Puri and Peters.

9        In addition, Donegan, Staddon and Puri are the government's only source for

10   authenticating and providing the necessary foundation for critical emails involving the

11   Defendants, and other evidence regarding the POINT transaction -- evidence that the

12   Defendants are well aware were never produced by any U.S. based source.  Donegan,

13   Staddon and Puri are the only government witnesses able to testify as to critical email

14   communications and telephone calls with the Defendants that provide direct evidence as

15   to Defendants' knowledge and state of mind regarding the POINT tax shelter.  Like the

16   depositions upheld by the Eleventh Circuit in *Drogoul*, "'[t]he testimony of these

17   [prospective witnesses] lies at the very core of the charges in the indictment, and its

18   refutation the heart of the defense."  1 F.3d at 1554 (11th Cir. 1993).

19       The Defendants purposefully conducted portions of their offense overseas

20   knowing that their clients and the IRS would have difficulty independently verifying such

21   offshore activities.  Their choice to conduct their activities offshore should not be

22   permitted to be used as a weapon against the government's efforts to effectively present

23   its criminal case.

24   C.   **No Countervailing Factors Weigh Against the Granting of Depositions**

25        *1.    United States will consent to Defendants' presence at the depositions.*

26        The conduct of the depositions in England will not interfere with Defendants' right

27   to confrontation.  Barring any changes in circumstances regarding Defendants' risk of

28   flight, the United States anticipates that it will recommend that both Wilk and Greenstein,

1  along with their respective counsel, be permitted to travel and personally attend the

2  depositions.

3      **2.      *Testimony will be preserved in a manner that will permit the jury to fully assess witnesses' demeanor and credibility.***

4

5  If granted, the United States will seek to have each deposition videotaped as well

   as transcribed in order that the character and manners of each witness is preserved for the
6
   jury to see and hear.  Furthermore, the United States will respectfully request that the
7
   Court personally attend the depositions in order to make contemporaneous evidentiary
8
   rulings on the record.  The live presence of the Court will result in the preservation of
9
   testimony that will be immediately trial worthy, without lengthy and awkward post
10
   deposition hearings and editing to deal with objections and motions in limine.
11
                              **IV.  CONCLUSION**
12
        For the foregoing reasons, the United States respectfully requests that the Court
13
   grant leave to take pursuant to Fed. R. Crim P. 15(a), depositions of Chris Donegan, John
14
   Staddon, Rajan Puri, and Martin Peters.
15
        DATED this 16th day of October, 2009.
16

17                                         Respectfully submitted,

18                                         JENNY A. DURKAN
                                           United States Attorney
19
                                           s/ *Katheryn Kim Frierson*
20                                         KATHERYN KIM FRIERSON
                                           Assistant United States Attorney
21                                         WSBA # 37794
                                           United States Attorney's Office
22                                         700 Stewart Street, Suite 5220
                                           Seattle, WA 98101
23                                         Phone: (206) 553-7970
                                           Email: Katheryn.K.Frierson@usdoj.gov
24
                                           s/ *Mark N. Bartlett*
25                                         MARK N. BARTLETT
                                           First Assistant United States Attorney
26                                         WSBA # 15672
                                           United States Attorney's Office
27                                         700 Stewart Street, Suite 5220
                                           Seattle, WA 98101
28                                         Phone: (206) 553-1018
                                           E-mail: Mark.Bartlett@usdoj.gov

US Motion to Take Depositions/ – 12
US v. Greenstein et al, CR08-296RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s).  I hereby certify that I have served the attorney(s) of record for the defendant(s) that are non CM/ECF participants via telefax.

s/Anna Chang
ANNA CHANG
Paralegal
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone:  (206) 553-2274
Facsimile:  (206) 553-2502
E-mail: Anna.Chang@usdoj.gov

CERTIFICATE OF SERVICE